IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| v. | : | Criminal Action No. 07-74-GMS |
| ELVIN DEMPSEY, | : | |
| Defendant. | : | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION
TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS**

Defendant, Elvin Dempsey, by and through his undersigned counsel, Eleni Kousoulis, Assistant Federal Public Defender for the District of Delaware, respectfully submits this Memorandum of Law in support of his Motion to Suppress Physical Evidence and Statements. For the reasons set forth below, Mr. Dempsey seeks to exclude the Government's admission, at trial, of any and all physical evidence illegally seized by law enforcement officials on or about May 8, 2007, including any and all statements made subsequent to the illegal search.

**I. INTRODUCTION**

On June 5, 2007, the Grand Jury for the District of Delaware returned a three-count Indictment with Notice of Forfeiture against Mr. Dempsey, charging him with: (1) possession with intent to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); (2) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A); and (3) possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). On November 8, 2007, Mr. Dempsey filed a Motion to Suppress Physical Evidence and Statements, arguing that law enforcement officials lacked probable cause to search his home based on an invalid

search warrant, and requesting a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978). On December 11, 2007, the Government filed its response, asserting that the search warrant affidavit contained sufficient information establishing probable cause, and that the Court should not grant Mr. Dempsey's request for a Franks hearing. On January 17, 2008, and February 21, 2008, this Court conducted a Franks hearing and evidentiary hearing to determine the motions.

## II. PROPOSED FINDINGS OF FACT

### A. The Search Warrant Application & Subsequent Execution

On May 8, 2007, Wilmington Police Detectives Randolph Pfaff and Danny Silva applied for, and received, a daytime search warrant for 941 Kirkwood Street in Wilmington, Delaware, and "Elvin G. Dempsey aka (Ocbar)," from the Justice of the Peace Court #20.

The Affidavit supporting the search warrant application stated the following relevant facts:

(a) On May 7, 2007, Detective Sergeant [Liam] Sullivan contacted Detectives Pfaff and Silva and informed them that he received information from a reliable confidential informant that "Ocbar" would travel to Philadelphia, Pennsylvania on May 8, 2007 to pick up heroin;

(b) The informant stated that Ocbar drove a gold Nissan Altima rental car with unknown Pennsylvania tags, and that upon return to Delaware, Ocbar would hide the heroin at 941 Kirkwood Street;

(c) Detectives Pfaff and Silva knew that Ocbar's real name was Elvin Dempsey, and Detective Pfaff conducted a warrant check on him. The check revealed that he was wanted in state court for robbery and possession of a firearm during a felony;

(d) Detective [Charles] Emory established surveillance at 941 Kirkwood Street and informed Detectives Pfaff and Silva that he saw a gold Nissan Altima parked in front of the residence. Detective Emory identified Mr. Dempsey as one of the vehicle's occupants and saw him enter the residence.

(e) Detective Pfaff conducted a registration check of the Nissan Altima and found that it was registered to Enterprise Leasing in Radnor, Pennsylvania.

(f) Detectives Pfaff and Silva stated that they conducted a motor vehicle stop during surveillance, and the subject advised them that he had received a bag of heroin from "Ocbar," and that "Ocbar" was still at 941 Kirkwood Street and in possession of more heroin and a firearm.

Detectives Pfaff and Silva arrived at 941 Kirkwood Street and served the warrant. Mr. Dempsey and two other individuals were found at the residence, and the detectives took Mr. Dempsey into custody.

During a search of the residence, the officers found: (1) 1268 heat-sealed plastic bags, each containing blue glassine baggies stamped "HOLLYWOOD." The baggies contained an off-white, powder substance that later field-tested positive for heroin and weighed 31.42 grams; (2) one baggie containing 2.60 grams of white chunky substance that later field-tested positive for cocaine; (3) three ziplock baggies containing 3.7 grams of marijuana; (4) a .22 caliber Taurus PT-22 handgun; (5) a .32 caliber Colt revolver; (6) five Remington .22 caliber rounds; and (7) empty baggies.

**B. January 17, 2008 Evidentiary Hearing Testimony**

On January 17, 2008 and February 21, 2008, this Court conducted a Franks hearing and evidentiary hearing on Mr. Dempsey's motion. At the January hearing ("Jan. Tr."), Mr. Dempsey called Eric Pittman, the subject referred to in the search warrant affidavit, and the Government called three witnesses: Lieutenant Liam Sullivan, a Sergeant of the Wilmington Police Department's Drug Organized Crime and Violence Unit at the time of Mr. Dempsey's arrest; Detective Danny Silva, a seven-year veteran of the Wilmington Police Department's Drug Organized Crime and Violence Unit; and Detective Randolph Pfaff, of the Wilmington Police Department's Drug Organized Crime and Violence Unit. At the February hearing ("Feb. Tr."), Mr. Dempsey called Tracy Watson, Mr. Pittman's cousin, and recalled Mr. Pittman as a rebuttal witness. The relevant testimony is

summarized below.

### 1. Eric Pittman's Testimony

Mr. Pittman, an admitted heroin user, testified that he borrowed Mr. Dempsey's Nissan Altima rental car on the night of May 7, 2007. (Jan. Tr. 18, 31-32). On the morning of May 8, 2007, Mr. Pittman picked up Mr. Dempsey from the New Castle area and dropped him off at 941 Kirkwood Street. Mr. Pittman then picked up Tracy Watson, his cousin, and returned to Mr. Dempsey's house because they were going to see Ms. Watson's relative at the hospital. (Jan. Tr. 16-18, 28, 33). Mr. Dempsey got into the car to console Ms. Watson regarding her relative, but he did not go to the hospital because of a business deal related to a home remodeling job. (Jan. Tr. 19, 28, 33-34). Mr. Pittman testified that he did not receive any heroin from Mr. Dempsey. (Jan. Tr. 34).

Mr. Pittman and Ms. Watson proceeded to the hospital and were immediately surrounded by law enforcement officials in the parking lot. (Jan. Tr. 19-20). Mr. Pittman testified that the officers initially mistook him for Mr. Dempsey, but Detective Sullivan recognized him and informed the other officers of his identity. (Jan. Tr. 20-22, 40).

Mr. Pittman testified that the officers took him into custody and told him that they could not let him go until after they served warrants and arrested Mr. Dempsey. (Jan. Tr. 23, 42). Mr. Pittman further testified that the officers interviewed him at the police station, specifically Detective Sullivan, and that he did not tell the officers that Mr. Dempsey had given him a bag of heroin, or was in possession of heroin or a firearm. (Jan. Tr. 25, 42-45). Mr. Pittman also testified that the officers did not find heroin or an empty packaging bag on him during the search at the scene. (Jan. Tr. 42).

### 2. Lieutenant Sullivan's Testimony

Lieutenant Sullivan testified that he was involved in Mr. Pittman's vehicle stop and subsequent

interrogation. Lieutenant Sullivan testified that he previously knew Mr. Pittman and his family, and was aware of his drug use prior to the May 8, 2007 vehicle stop. (Jan. Tr. 53).

According to Lieutenant Sullivan, Mr. Pittman was scared and nervous during the encounter. Detectives Pfaff and Silva told him that an empty bag of heroin was found either on Mr. Pittman or in the car. (Jan. Tr. 54, 60-63). Lieutenant Sullivan testified that he did not know what happened to the empty bag. (Jan. Tr. 60-63).

Detectives Pfaff and Silva initially conducted Mr. Pittman's interrogation, but Mr. Pittman asked to speak to Lieutenant Sullivan and expressed concern about receiving a probation violation. (Jan. Tr. 55-56). Mr. Pittman admitted that he went to 941 Kirkwood Street to buy heroin, and told Lieutenant Sullivan that there was "a lot" of heroin at the residence, and possible guns. (Jan. Tr. 56-59).

Lieutenant Sullivan stated that Mr. Pittman was worried that Mr. Dempsey would find out that he had talked to him and kill him. (Jan. Tr. 57). Detectives Pfaff and Silva were present at various times during the interrogation, and Lieutenant Sullivan did not take any notes. (Jan. Tr. 57-58).

3. Detective Silva's Testimony

Detective Silva also testified regarding Mr. Pittman's vehicle stop and interrogation. Detective Silva does not recall personally searching Mr. Pittman. (Jan. Tr. 79). Detective Silva testified that an officer searched Mr. Pittman and found an empty glassine bag, stamped "Hollywood." (Jan. Tr. 69-70,79,85). Detective Silva stated that the bag was thrown away because it "had no value other than drug paraphernalia, and we weren't going to charge Mr. Pittman with it." (Jan. Tr. 70,79-80). Detective Silva did not recall making any notation of the empty bag in his notes. (Jan. Tr. 81-

83). Detective Silva, however, stated that the reason the officers were conducting surveillance at 941 Kirkwood Street that morning was because of a drug investigation. (Jan. Tr. 78). According to Detective Silva, Mr. Pittman was very scared and shaken during his subsequent interrogation, and he informed the officers that Mr. Dempsey would kill him if he found out that he talked to the police. (Jan. Tr. 71). Detective Silva was not present during Lieutenant Sullivan's interrogation of Mr. Pittman, but Mr. Pittman later spoke to Detectives Silva and Pfaff and admitted that he got a bag of heroin from Mr. Pittman. (Jan. Tr. 71-74). Detective Silva testified that Detective Pfaff wrote down the details of Mr. Pittman's interrogation, but later left the room to type the search warrant. (Jan. Tr. 74, 85).

  4. <u>Detective Pfaff's Testimony</u>

Detective Pfaff testified that he could not recall if he was the officer that searched Mr. Pittman during the vehicle stop, but he did not believe that he did, and he did not see a bag of heroin or empty bag recovered from Mr. Pittman. (Jan. Tr. 93-94). Detective Pfaff stated that he found out about the empty bag of heroin from Lieutenant Sullivan. (Jan. Tr. 93-94). Detective Pfaff took notes during Mr. Pittman's interrogation, and he stated that Mr. Pittman told him that he received a bag of heroin from Mr. Dempsey. (Jan. Tr. 88, 95-97). Detective Pfaff specifically asked Mr. Pittman if there were any dogs or kids in the house, how many people were in the house, and whether the house was fortified. (Jan. Tr. 88). Mr. Pittman responded that there were two men in the house, but no kids or dogs, and that the door was not fortified. (Jan. Tr. 89). Detective Silva later advised Detective Pfaff that Mr. Pittman had informed him that the two subjects in the house may be armed with handguns. (Jan. Tr. 89).

At the conclusion of the hearing, the Government entered into evidence Mr. Pittman's May 7, 2008 heroin lab report. (Jan. Tr. 97). The Defense entered into evidence Mr. Pittman's December

6

21, 2007 supporting affidavit. (Jan. Tr. 98).

### C. February 21, 2008 Evidentiary Hearing

#### 1. Ms. Watson's Testimony

Ms. Watson testified that Mr. Pittman picked her up from her home, and they stopped at Mr. Dempsey's house. (Feb. Tr. 3-4). Mr. Pittman went inside for a few minutes and returned with Mr. Dempsey. (Feb. Tr. 4, 9). Mr. Dempsey briefly spoke to Ms. Watson about her sister, and she and Mr. Pittman stopped for breakfast before proceeding to the hospital. (Feb. Tr. 4-5, 10-11, 18-19). Ms. Watson testified that she did not see Mr. Pittman with any drugs in the car. (Feb. Tr. 5,7).

Ms. Watson testified that when they arrived at the hospital, police officers surrounded their car and ordered them out of the vehicle. (Feb. Tr. 5, 11-14). Ms. Watson testified that she saw Mr. Pittman's pat-down search, but did not see the officers recover any evidence. (Feb. Tr. 6, 14-15). The officers took Ms. Watson to the police station and told her that she would not be released until after they arrested Mr. Dempsey. (Feb. Tr. 6-7).

#### 2. Mr. Pittman's Testimony

The Defense recalled Mr. Pittman regarding the May 8, 2007 interrogation by the Wilmington Police Department. Mr. Pittman testified that he never told any of the detectives that he was scared of Mr. Dempsey, or that Mr. Dempsey would kill him if he found out that Mr. Pittman had spoken to the police. (Feb. Tr. 21). . Mr. Pittman never told the police that there were drugs or guns at 941 Kirkwood Street. (Feb. Tr. 21).

### III. PROPOSED CONCLUSIONS OF LAW

The Fourth Amendment's Warrant Clause provides, in pertinent part, that no warrant shall issue without probable cause, supported by Oath or affirmation. See U.S. Const. amend. IV. In Franks v. Delaware, 438 U.S. 154 (1978), the Supreme Court held that criminal defendants have the

7

right to challenge the truthfulness of factual statements contained in an affidavit supporting a search warrant, after the warrant has been issued and executed.

In Franks, the Court explained:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

Id. at 155-56. Thus, a defendant must prove by a preponderance of the evidence that: (1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions were material, or necessary, to the probable cause determination. See Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997) (citing Franks, 438 U.S. at 171-72).

There is a presumption of validity regarding the affidavit supporting the search warrant, and the defendant's challenge and preliminary showing must be "supported by more than a mere desire to cross-examine. There must be allegations of a deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." Id. at 171. The defendant's offer of proof must specifically reference the portion of affidavit that is alleged to be false, and must be accompanied by a statement of reasons, such as affidavits or reliable witness statements. Id.

In Wilson v. Russo, 212 F.3d 781 (3d Cir. 2000), the Third Circuit, noting the D.C. Circuit's lament that the Supreme Court "gave no guidance concerning what constitutes a reckless disregard for the truth in Fourth Amendment cases," identified the following standard regarding the affiant's

misstatements or omissions:

> In evaluating a claim that an officer both asserted and omitted facts with reckless disregard for the truth, we hold that: (1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would want to know; and (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting.

Id. at 783,787 (quoting United States v. Davis, 617 F.2d 677, 694 (D.C. Cir. 1979)).

If the court is faced with a tainted warrant, the next step is to "excise the tainted evidence and determine whether the remaining, untainted evidence in an affidavit would provide a neutral magistrate with probable cause to issue a warrant." United States v. Herrod, 962 F.2d 1131 (3d Cir. 1992) (quoting United States v. Vasey, 834 F.2d 782, 788 (9th Cir. 1987)). See also, United States v. Johnson, 690 F.2d 60, 63 (3d Cir. 1982) cert. denied, 459 U.S. 1214 (1983) (holding that "even assuming that some factual averments in the affidavit are tainted, they do not vitiate a warrant which is otherwise validly issued upon probable cause reflected in the affidavit"). Cf., Russo, 212 F.3d at 789 (requiring the court to excise "the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the "corrected" warrant affidavit would establish probable cause," when dealing with an omission).

Here, law enforcement officials asserted in the search warrant affidavit that Mr. Pittman informed them that he had received a bag of heroin from Mr. Dempsey, and that Mr. Dempsey was still at 941 Kirkwood Street and in possession of a large volume of heroin and a firearm. As demonstrated by Mr. Pittman's affidavit and testimony, and supported by Ms. Watson's testimony, this conversation never occurred. Mr. Pittman testified that he never made these statements to law enforcement officials, and that he was not scared of Mr. Dempsey or fearful of any retaliation by him.

9

During the evidentiary hearings, the detectives testified that they found an empty heroin bag on Mr. Pittman during the vehicle stop, but none of the officers could recall who searched him, who found the bag and what happened to this evidence. In fact, Detective Pfaff testified that Lieutenant Sullivan advised him of the empty bag being recovered, and Lieutenant Sullivan testified that Detectives Pfaff and Silva advised him about the empty bag.

Remarkably, despite conducting drug surveillance at 941 Kirkwood Street that morning, none of the officers noted or preserved this discovery, which would seemingly corroborate the assertions made in the search warrant's affidavit. Additionally, none of the officers testified that Mr. Pittman was under the influence at the time of the vehicle stop or during the subsequent interrogation. To the contrary, Ms. Watson testified that she did not observe Mr. Pittman with drugs or ingest them during their drive to the hospital, and law enforcement officials did not testify that they found drugs in the vehicle or on Mr. Pittman.

Mr. Dempsey asserts that the law enforcement official's inclusion of the false statement by Mr. Pittman was made with reckless disregard for the truth because the officers had "obvious reasons to doubt the truth of what" they asserted. Russo, 212 F.3d at 783. When this paragraph is excised from the affidvait, the only information available to the Magistrate Judge would have been that: (1) Detectives Sullivan, Pffaf and Silva received a tip from a confidential informant that Mr. Dempsey, who was wanted on a robbery-related warrant, was going to Philadelphia to pick up heroin in the early morning hours of May 8, 2007, and would return to Delaware and hide the package at 941 Kirkwood Street; (2) Mr. Dempsey drove a gold Nissan Altima rental car; and (3) Detective Charles Emory saw the vehicle parked in front of the residence, and Mr. Dempsey enter the residence. This evidence alone, however, does not support a finding that probable cause was present to support the issuance of a search warrant.

10

Here, the officers immediately acted on the confidential informant's tip, which proved to be wrong, instead of taking independent steps to corroborate it. The officers offered no evidence or facts establishing the informant's veracity or reliability, and offered no evidence establishing that they were involved in an on-going investigation of Mr. Dempsey or otherwise had independent or intimate knowledge of any alleged drug activities.

Moreover, the officers' mistaken identification of Mr. Pittman during the vehicle stop reveals that their investigation of the confidential informant's tip and Mr. Dempsey's activities was minimal and lacking. As previously noted, the tip stated that Mr. Dempsey would travel to Philadelphia in the early morning hours to pick up heroin, and would return to Delaware to store it at 941 Kirkwood Street. Instead, the officers followed the wrong man - presumably because they did not who Mr. Dempsy was and made no attempts to find out - to a hospital and conducted a vehicle stop in the parking lot. This vehicle stop produced no drug evidence that was found or preserved.

Thus, without inclusion of the false statement in the affidavit, the officers lacked probable cause to search Mr. Dempsey and his home.[1] Accordingly, all evidence, including any alleged statements, must be suppressed pursuant to Franks. See also, Wong-Sun v. United States, 471 U.S. 407 (1963).

---

[1] Mr. Dempsey also notes that the search warrant referenced a prior search at a residence that did not produce any narcotics or firearms. Mr. Dempsey further asserts that if this information were included in the search warrant affidavit, it would have negated a finding of probable cause in this matter. See Russo, 212 F.3d at 789.

## IV. **CONCLUSION**

For the foregoing reasons, Mr. Dempsey that this Court suppress all physical evidence in this matter because it is the fruit of the officers' unlawful activities.

                                    Respectfully submitted,

                                    /s/ Eleni Kousoulis
                                  Eleni Kousoulis, Esquire
                                  Assistant Federal Public Defender

                                  Attorney for Defendant, Elvin Dempsey

Federal Public Defender
One Customs House
704 King Street, Suite 110
Wilmington, DE 19801
(302) 573-6010
ecf_de@msn.com