IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 07-74 GMS |
| | ) | |
| ELVIN DEMPSEY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM**

**I.    INTRODUCTION**

On June 5, 2007, the Grand Jury for the District of Delaware indicted Elvin Dempsey ("Dempsey") for possession with intent to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); possession of a firearm in furtherance of a drug trafficking crime, in violation of 21 U.S.C. §§ 924(c)(1)(A); and possession of a firearm by a felon, in violation of 21 U.S.C. §§ 924(g)(1) and 924(a)(2). (D.I. 3, 4.) On November 8, 2007, Dempsey filed a Motion to Suppress Physical Evidence and Statements. (D.I. 16.) Beginning on January 17, 2008, and continuing on February 21, 2008, the court held a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), in connection with the motion. The parties then submitted proposed findings of fact and conclusions of law. (D.I. 34, 35, 37.) The court has considered the testimony elicited during the *Franks* hearing and the arguments presented in the parties' submissions concerning the issues raised by Dempsey's motion. For the following reasons, the court concludes that Dempsey has not proven by a preponderance of the evidence that the averring police officers knowingly and deliberately, or with reckless disregard for the truth, made false statements or omissions creating a falsehood in applying for the warrant to search Dempsey's residence. The court will therefore deny Dempsey's motion.

1

## II. FINDINGS OF FACT

At the hearing beginning in January ("Jan. Tr.") and continuing in February ("Feb. Tr."), the United States called three witnesses, all of whom were members of the Wilmington Police Department's Drug and Organized Crime and Violence Unit at the time of Dempsey's arrest: then-Sergeant Liam Sullivan ("Sullivan"),[1] Detective Danny Silva ("Silva"), and Detective Randolph Pfaff ("Pfaff"). Dempsey called Eric Pittman ("Pittman") and Tracy Watson ("Watson"), Pittman's cousin. After listening to the testimony of each witness, and observing the demeanor of each, the court finds that the Sullivan's, Silva's, Pfaff's, and Watson's accounts of the facts are credible. The court further finds that Pittman's account of the facts is credible, with certain critical exceptions. The following, based on these findings, represents the court's essential findings of fact as required by Rule 12(d) of the Federal Rules of Criminal Procedure.

On May 7, 2007, Sullivan told Pfaff and Silva that he had received a tip from a confidential informant about a man known as Ocbar. The informant told Sullivan that Ocbar would travel to Philadelphia, Pennsylvania, early on May 8, 2007, to obtain a heroin shipment. The informant described Ocbar's car as a gold Nissan Altima rental car with Pennsylvania license plates. According to the informant, Ocbar would return to Delaware and store the drugs in a house at 941 Kirkwood Street, Wilmington, Delaware. Pfaff and Silva had learned that "Ocbar" was Dempsey's nickname. Upon checking police records, Pfaff found two outstanding warrants for Dempsey's arrest, one for robbery and one for possession of a firearm during the commission of a felony.

On the morning of May 8, 2007, acting on the informant's tip, at least one Wilmington police officer started surveilling the house at 941 Kirkwood. Also that morning, Pittman picked

---

[1] Sullivan was a Wilmington Police Department Sergeant at the time of Dempsey's arrest. He is now a Lieutenant with the Elsmere Police Department.

up Dempsey from elsewhere in the New Castle area and dropped him off at 941 Kirkwood. (Jan. Tr. 17-18.) Pittman drove a gold Nissan Altima rental car with Pennsylvania license plates. Dempsey had rented the car, but, according to Pittman, Dempsey had loaned the car to Pittman the night before. (Jan. Tr. 18, 31-32.) After dropping Dempsey off, Pittman then picked up Watson. Pittman and Watson planned to go to the hospital to visit Watson's relative, who had been injured in a car accident. (Jan. Tr. 16-18, 28.) First, however, Pittman returned with Watson to 941 Kirkwood. While Watson waited in the car, Pittman went inside the house. At the hearing, Sullivan testified that Pittman admitted to sniffing a bag of heroin that he obtained from Dempsey while inside.[2] (Jan. Tr. 56-57.)

A few minutes later, Pittman came out of the house accompanied by Dempsey. According to Pittman, he had returned to 941 Kirkwood because he thought that Dempsey would come with him and Watson to the hospital. (Jan Tr. 33.) But Dempsey decided not to go to the hospital with Pittman and Watson because he needed to pursue an opportunity for home remodeling work. (Jan. Tr. 18, 33-34.) Nonetheless, Dempsey came out to the car with Pittman to express his condolences to Watson about her hospitalized relative. Pittman and Watson then left for the hospital.

Mistaking Pittman for Dempsey, the officers followed. When Pittman and Watson arrived at the hospital parking lot, several Wilmington police officers conducted a felony vehicle stop with guns drawn. (Jan. Tr. 69.) The police removed Pittman and Watson from the car, not realizing their mistake. Sullivan, who had met Pittman before and knew his family, finally recognized Pittman. Pittman was searched during the stop. Silva, Pfaff, and Sullivan all testified that, sometime during or after the stop, an officer discovered a small empty plastic bag that had

---

[2] At the hearing, Pittman testified that he did not get any heroin from Dempsey or tell the police that he had done so. (Jan. Tr. 33.)

contained heroin either on Pittman's person or in the car.[3] But none of them remembered who had found the bag, or when it was found. (Jan. Tr. 60-65; 69-70; 88; 94.) Nor did they retain the bag for use as evidence, or note its discovery in a report. In any case, the police brought Pittman and Watson in separate cars to the Wilmington police station. Upon their arrival at the station, the police told Pittman and Watson that they were not the targets of the investigation, but that they could not be released until Dempsey's arrest. The police then took Pittman to an interrogation room.

What happened in that room is the central issue for the purposes of this motion.[4] According to Sullivan, Pittman asked to speak with him, rather than with Pfaff or Silva, because Pittman knew Sullivan from several years before.[5] (Jan. Tr. 53-54.) For this reason, Sullivan initially spoke with Pittman alone. Silva and Pfaff joined the interrogation later. During the interrogation, Pittman seemed scared and nervous. (Jan. Tr. 54, 71.) Sullivan testified that Pittman was concerned about being charged with violating the terms of his probation.[6] (Jan. Tr. 55.) In addition, Pittman was afraid that, if Dempsey found out that he was talking to the police, Dempsey would kill him. (Jan. Tr. 57, 71.)

Sullivan asked Pittman about Ocbar. According to Sullivan, Pittman told Sullivan that he had gone to 941 Kirkwood to buy a bag of heroin from Ocbar, and had sniffed a bag while there that morning. (Jan. Tr. 57.) In addition, according to Sullivan, Pittman told both him and Silva that there was "a lot" of heroin at the house: nine or ten "logs," the equivalent of nearly 1300

---

[3] Pittman testified that no such bag was found. (Jan. Tr. 25-26, 34.)
[4] Since Watson was not present in the room, none of her testimony bears directly on what was said during Pittman's interrogation.
[5] Indeed, Pittman testified that Sullivan had stolen a few hundred dollars from him when Pittman was in high school. (Jan. Tr. 40-41.)
[6] At the time, Pittman was on probation for a felony drug trafficking offense committed in New York. (Jan. Tr. 36-37.)

small bags of heroin. (Jan. Tr. 57-59.) Sullivan took no notes during the interrogation. (Jan. Tr. 57-58.)

Later, when Pfaff joined the interrogation, he asked Pittman certain "tactical" questions that, according to Pfaff, are routinely asked when preparing to search a residence. (Jan. Tr. 88-89.) These questions included how many people were inside the house, whether they had guns, whether there were dogs or children inside, and whether the door was fortified. (Jan. Tr. 88-89.) According to Pfaff, Pittman told him that there were two men inside the house at 941 Kirkwood; that the two men may have handguns; and that there were no children, dogs, or fortifications. (Jan. Tr. 89.) Pfaff recorded these answers on a piece of notebook paper admitted into evidence at the hearing. (Jan. Tr. 89, GX-1.)

Based in part on the information elicited during Pittman's interrogation, Pfaff prepared an affidavit in support the officers' request for a warrant to search Dempsey's house at 941 Kirkwood Street. The affidavit contained a six-paragraph section averring the central facts in support. The first paragraph described Pfaff's and Silva's experience and qualifications. The second referred to a prior search warrant that Silva and Pfaff executed against Dempsey, but omitted the fact that Silva and Pfaff had found no contraband during the prior search. The third paragraph contained the informant's tip that Dempsey would drive a gold Nissan Altima to Philadelphia to obtain heroin. The fourth linked the nickname Ocbar to Dempsey, and stated that Dempsey had an outstanding warrant for his arrest. The fifth established that a Wilmington police officer, while surveilling 941 Kirkwood that morning, had seen Dempsey exit a gold Nissan Altima rental car and enter the house.

This sixth and final paragraph relates to Pittman's stop and interrogation statements. It reads in its entirety as follows:

> That your affiants can state that relative to the surveillance a motor vehicle stop was conducted and the subject stopped advised that he/she received a bag of heroin from "Ocbar". The subject further advised that "Ocbar" was inside the house 941 Kirkwood Street and that he was currently in possession of more heroin and possibly armed with a firearm, and that there is a second subject who might also posses a firearm in the house.

(D.I. 20 at 15-16 (errors in original).) This paragraph substantiated that drugs were inside 941 Kirkwood. Thus, the finding of probable cause to search the house for drugs and contraband on May 8, 2007, relied on what Silva and Pfaff aver that Pittman told them during his interrogation that morning.[7]

That same day, based on the affidavit prepared by Pfaff and signed by both Pfaff and Sivla, a search warrant was issued. Silva, Pfaff, and other Wilmington police officers then searched the house at 941 Kirkwood Street. They found more than one thousand small, heat-sealed plastic bags containing heroin, small amounts of cocaine and marijuana, empty plastic bags, and two handguns. (D.I. 35 at 1.)

## III.  CONCLUSIONS OF LAW

Dempsey seeks to suppress admission of the physical evidence seized by the Wilmington police officers on May 8, 2007, as well as any alleged statements made during and after his arrest.[8] (D.I. 16.) Dempsey contends that the officers lacked probable cause to search his house because the search was predicated on an invalid search warrant. (D.I. 34, 37.) According to

---

[7] At the *Franks* hearing, Pittman categorically denied all material aspects of Sullivan's, Pfaff's, and Silva's accounts of the interrogation. Specifically, Pittman denied being scared that Dempsey would kill him (Feb. Tr. 21); telling Sullivan that he had gotten heroin at 941 Kirkwood from Ocbar (Jan. Tr. 25, 42-45); telling Sullivan that there was a lot of heroin at the house (Jan. Tr. 25-27; Feb. Tr. 21); and answering Pfaff's "tactical" questions regarding the presence of fortifications, dogs, and guns. (Feb. Tr. 21.) Pittman also denied that someone had recovered an empty heroin bag from him. (Jan. Tr. 42.)

[8] It is unclear to the court which statements, if any, Dempsey seeks to suppress. Dempsey specifies no particular statement in his briefs.

Dempsey, the affidavit in support of the warrant to search his house at 941 Kirkwood Street included material misstatements and omissions rendering it legally invalid. In short, Dempsey claims that when Silva and Pfaff included paragraph six in their affidavit, and when they testified at the *Franks* hearing, they lied.

    A.    **Whether Silva and Pfaff Included Material Misstatements or Omissions in Their Affidavit**

The Fourth Amendment to the United States Constitution provides, in part, that "no Warrants shall issue but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. Under *Franks v. Delaware*, a criminal defendant may challenge the truthfulness of statements made in an affidavit supporting a warrant. *Franks*, 438 U.S. at 155-56. To do so, the defendant must first make a "substantial preliminary showing" that the affidavit supporting the warrant contained a false statement or omission that was made knowingly or with reckless disregard for the truth and that is material to the finding of probable cause. *Franks*, 438 U.S. at 171; *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006) (internal citations omitted). Upon making this showing, the defendant is entitled to a hearing on the issue. At the hearing, the defendant bears the burden of proving by a preponderance of the evidence "(1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions were material, or necessary, to the probable cause determination." *Yusuf*, 461 F.3d at 383 (internal citations omitted). If the defendant's challenge is successful, then the fruits of a search made pursuant to the warrant must be suppressed, just as if probable cause was lacking on the face of the original affidavit. *Franks*, 438 U.S. at 155-56; *Yusuf*, 461 F.3d at 384 (internal citations omitted).

In this case, Dempsey made the requisite "substantial preliminary showing" through submitting a written statement by Pittman disputing the contents of the affidavit's sixth paragraph. The court accordingly held a *Franks* hearing on January 17, 2008, and continuing on February 21, 2008. (D.I. 29, 36.) At the hearing, Sullivan, Pfaff, and Silva essentially testified that Pittman had told them that the house at 941 Kirkwood Street contained Dempsey, drugs, and guns. Pittman essentially denied that he said anything of the sort. The question for the court is whether Dempsey has proven, by a preponderance of the evidence, that Pittman's account of what happened in the interrogation room – rather than that of the officers' – is the truth.

Dempsey argues that the officers' accounts are dubious. In particular, Dempsey points to ambiguities and inconsistencies between the officers' testimony with respect to the missing bag of heroin that was allegedly found when Pittman was stopped. If the bag were important enough to mention in the affidavit, Dempsey argues, then it was important enough to retain and record. And none of the officers knew who had found the bag, whether it had been found in the car or on Pittman's person, or what exactly happened to the bag afterwards. (Jan. Tr. 60-65; 69-70; 88; 94.) Indeed, neither Sullivan nor Pfaff handled or saw the bag. (Jan. Tr. 60-62; 94.) In response, the government explains that the officers did not think to keep the single bag because it was unimportant to their investigation of a suspected drug dealer and because they did not intend to bring charges against Pittman, since he was cooperating. (*E.g.*, Jan. Tr. 80.) In addition, Silva did recall seeing the bag, even if he did not remember where it was found. (Jan. 69-70.) Ambiguities surrounding the missing bag of heroin do raise questions, particularly when, as Dempsey argues, the officers deemed the fact that Pittman got the bag from Dempsey important enough to include it in the affidavit. The officers probably should have kept and recorded the bag to preempt subsequent evidentiary challenges such as this one. Nonetheless, the court finds

that the officers' explanation – that they were focused on finding the 1000 bags, not the one, and in any case did not plan to charge Pittman because he was cooperating – is credible.

With respect to Pittman's testimony, the government argues that it is unbelievable. Specifically, the government claims that Pittman's categorical denial of having answered Pfaff's so-called tactical questions, reflected in his notes, regarding the presence of children, guns, dogs, and fortifications at 941 Kirkwood Street is implausible. This is so, the government argues, because officers routinely ask such questions before entering a house suspected to contain drugs. (D.I. 35 at 12-13.) The government also challenges Pittman's credibility more generally, noting that he is a probationer with a history of lying to his probation officer, a longstanding heroin user, and personal friend of Dempsey's (Jan. Tr. 45-48). Moreover, the government argues that fear of Dempsey motivated Pittman to lie at the hearing about what he had said during his interrogation. (*Cf.* Jan. Tr. 57, 71.) The court agrees that Pittman's blanket denial of being asked routine questions with respect to the interior of the house seems unlikely, and that Pittman had a compelling reason to lie. The court finds that, as to his interrogation, Pittman's testimony is not credible.[9]

In sum, Dempsey bears the burden of disproving the officers' accounts with respect to what Pittman said in the interrogation room. Dempsey may have illustrated some ambiguities surrounding the bag of heroin found during Pittman's traffic stop. Nevertheless, he has failed to establish a fatal rebuttal to the generally consistent testimony of the officers, namely, that Pittman told them in the interrogation room that he had gotten heroin from Ocbar that morning, and that Ocbar was still in the house with another man and a lot of heroin. These are the critical facts contained in paragraph six of the affidavit. Because Dempsey failed to prove that Silva and

---

[9] The testimony of Watson, Dempsey's other witness, confirms much of Pittman's testimony as to undisputed facts, but simply does not bear upon those critical to Dempsey's *Franks* challenge.

Pfaff included material false statements in paragraph six of the affidavit with at least reckless disregard for the truth, the court finds that Dempsey has not met his burden under *Franks* to challenge the validity of the affidavit supporting the warrant.[10] Accordingly, the court finds that the search and seizure of this evidence did not violate the Fourth Amendment.

B.  **Whether To Suppress the Physical Evidence and Statements**

The police found contraband in the house at 941 Kirkwood when they searched it pursuant to the warrant. The court has found that the search and seizure did not violate the Fourth Amendment. The contraband found during the search -- including the 1268 bags of heroin and the two handguns – is therefore not barred from admission at trial.

For the reasons stated above, the court will deny the defendant's motion to suppress.

Dated: May 6, 2008

CHIEF, UNITED STATES DISTRICT JUDGE

FILED
MAY - 8 2008
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

---

[10] Dempsey's *Franks* argument with respect to the omission from the affidavit's third paragraph of the results of the prior search – that is, that no contraband was found – fails as well because that paragraph with the omitted information added would not preclude the finding of probable cause.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Criminal Action No. 07-74 GMS |
| | ) |
| ELVIN DEMPSEY, | ) |
| | ) |
| Defendant. | ) |

## ORDER

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The defendant's Motion to Suppress Physical Evidence and Statements (D.I. 16) is DENIED.

Dated: May 8, 2008

CHIEF, UNITED STATES DISTRICT JUDGE

FILED
MAY - 8 2008
U.S. DISTRICT COURT
DISTRICT OF DELAWARE