IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Criminal Action No. 07-74-GMS |
| ) | |
| ELVIN DEMPSEY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

**I. INTRODUCTION**

On June 5, 2007, the Grand Jury for the District of Delaware indicted the defendant, Elvin Dempsey ("Dempsey") for: (1) possession with intent to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(c) ("Count One"); (2) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) ("Count Two"); and (3) possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) ("Count Three"). (D.I. 3,4.) On October 22, 2008, following a three-day trial, a jury returned a verdict of guilty against Dempsey as to Count One and Count Three of the indictment.[1] (D.I. 65, 66.) On October 29, 2008, Dempsey filed the instant motion for judgment of acquittal pursuant to Fed. R. Crim. P. 29(c).[2] (D.I. 68.) In his motion, Dempsey challenges the sufficiency of the evidence presented at trial in connection with his conviction on Count Three of the indictment.[3] (*Id.* at 1.)

---

[1] As to Count Two of the indictment, the jury found Dempsey "Not Guilty." (D.I. 65.)

[2] Federal Rule of Criminal Procedure 29(a) states, in relevant part, that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Rule 29(c) further provides that a "defendant may move for judgment of acquittal . . . within 7 days after a guilty verdict."

[3] Briefing on this motion was completed on December 3, 2008. (D.I. 74.)

After having considered the record in this case, the parties' arguments and briefing, and the applicable law, the court concludes that the evidence presented at trial was sufficient to sustain the jury's guilty verdict as to Count Three of the indictment. The court will, therefore, deny the defendant's motion for judgment of acquittal. The court's reasoning is as follows.

## II. BACKGROUND[4]

Count Three of the indictment charges the defendant with possession of a firearm by a felon. (D.I. 3,4.) Specifically, it alleges that:

> On or about May 08, 2007, in the State and District of Delaware, ELVIN G. DEMPSEY, JR., defendant herein, having been convicted of a crime punishable by a term of imprisonment exceeding one year, to wit, a conviction on or about September 14, 1999, in the Superior Court in and for New Castle for the State of Delaware, did knowingly possess a firearm in and affecting interstate commerce, to wit, a Taurus, model PT22, .22 caliber pistol, serial number AYG637960, all in violation of Title 18, United States Code, Sections 922(g)(1) and 924 (a)(2).

(*Id.* at 2.)

At trial, to prove the allegations raised in Count Three, the government called several witnesses to testify concerning Dempsey's possession of the .22 caliber handgun. These witnesses included: (A) Detective Danny Silva ("Silva"), (B) Detective Michael Simmons ("Simmons"), (C)

---

[4] Much of the factual background surrounding this matter is well-known to the parties and has been recited extensively in prior memoranda, orders and submissions by the parties in this proceeding. As such, and because the court writes primarily for the parties, the court will focus only on certain evidence and testimony presented at trial relevant to Count Three of the indictment.

2

Detective Randolph Pfaff ("Pfaff"), (D) Special Agent Patrick Fyock ("Fyock"), and (E) Samadni Goldson ("Goldson").[5]

### A. Detective Danny Silva's Testimony

As its first witness, the government called Detective Danny Silva. (Tr. at 251.)[6] During his testimony, Silva testified that, on May 8, 2007 at approximately 12:03 p.m., the WPD executed a valid search warrant at the residence located at 941 Kirkwood Street in Wilmington, Delaware. (Tr. at 164, 173-75.) He described the first floor of this residence as being a small efficiency apartment, consisting of a front room/bedroom, a kitchen, and a bathroom. (*Id.* at 167-68.) When law enforcement officers entered the efficiency apartment, they found, among other things, the defendant located in the hallway between the kitchen and the bathroom, as well as another individual, Samadni Goldson, located on a bed in the front room/bedroom. (*Id.* at 169, 172.) Silva stated that the officers found no other individuals in the apartment. (*Id.* at 169, 172.)

In addition, Silva testified that, during the search, officers located several pieces of contraband within the apartment. (Tr. at 180.) Specifically, they found: (1) two "bundles" of heroin stamped "Hollywood" located on a table in the front room; (2) a "half-log" of heroin stamped "Hollywood" located in a toaster oven in the front room; and (3) "nine logs" of heroin stamped

---

[5] Detectives Silva, Simmons, and Pfaff are vice detectives of the Wilmington Police Department (the "WPD"). Special Agent Fyock is an agent of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (the "ATF"). Each of these law enforcement officers were directly involved in either the investigation, arrest, and/or post-arrest interview of the defendant in this case. Goldson is an individual that was present during the search of the residence where the .22 caliber handgun at issue was found.

[6] "Tr." refers to the October 20-22, 2008 trial transcripts docketed in this case at D.I. 69-71.

"Hollywood" hidden in the ceiling above the bathroom.[7] (*Id.* at 180, 182-84.) The nine logs of heroin found in the bathroom ceiling were packaged in a "knit cap, wrapped with a green rubber-band." (*Id.* at 188.) In total, officers recovered approximately 1,268 "baggies" of heroin from the first-floor efficiency apartment.[8] (*Id.* at 184.) Silva also testified that he found a Verizon telephone bill under the name "Elvin Dempsey" with the address "941 Kirkwood Street" located in a dresser drawer in the efficiency apartment. (Tr. at 176-77.)

Silva testified that a .22 caliber Taurus semi-automatic handgun was also discovered in a closet on top of a pile of clothing in the efficiency apartment. (Tr. at 188, 191-92, 262.) The .22 caliber handgun was wrapped inside of a black knit cap, and held in place by a green rubber-band. (*Id.* at 196.) At trial, Silva described this handgun in detail. Specifically, he stated that the gun was:

> black in color, with a brown wood grip. It had a magazine in the magazine well. It was empty. And in order to open the weapon, it's not your common weapon where you just slide, get the slide, which is the top part of the weapon. You had to break it in the middle in order to get into the actual . . . receiver.

(*Id.* at 198.) Silva further testified that five rounds of .22 caliber ammunition were also located in a flower vase in the front room of the efficiency. (*Id.*) In addition, Silva stated that a second firearm, a .32 caliber Colt revolver, was discovered behind the drywall in the efficiency's kitchen wall. (Tr. at 190-93.) Silva stated that there were no fingerprints found on either of the guns recovered from the search, and that he did not know whether DNA testing of the guns was completed. (*Id.* at 201,

---

[7] Regarding the approximate amounts of heroin located during the search, the court notes the following: (1) "two bundles" consists of approximately 26 bags of heroin; (2) a "half-log" consists of approximately 65 bags of heroin; and (3) "nine logs" consists of approximately 1170 bags of heroin. (D.I. 73 at 2.)

[8] These "1,268 baggies of heroin" weighed in at 31.42 grams.

4

205.) Silva described the .22 caliber Taurus recovered from the search as a "breach break" weapon. (*Id.* at 198.) He indicated that the .22 caliber Taurus handgun is "unique" because you had to 'break it" in the center in order to access the receiver and unload the chamber. (*Id.*)

After recounting the search, Silva provided additional testimony regarding the defendant's arrest and the defendant's subsequent interview at the police station. (Tr. at 205-06, 264.) Specifically, Silva testified that he read Dempsey the *Miranda* warnings; and that after being advised of his rights, Dempsey indicated that he understood those rights, and he then agreed to speak with investigating officers in an interview. (*Id.* at 206-07.) Once at the police station, Dempsey was first interviewed by Detectives Silva and Pfaff. (*Id.* at 206.) In that interview, Dempsey originally told Silva and Pfaff that 941 Kirkwood Street belonged to his father-in-law. (*Id.* at 207.) But, later in the interview, Dempsey told Silva and Pfaff that his father-in-law passed away, and left the house to Dempsey and his fiancé. (Tr. at 207.) Also, during that interview, when questioned about the heroin located in the residence, Dempsey initially denied any knowledge of any heroin located within the efficiency apartment. (Tr. at 208-09, 353-54.) Yet again, later in the interview, Dempsey eventually admitted to touching the heroin located on the front-room table, and to throwing the heroin up in the bathroom ceiling. (*Id.* at 255, 270.)

Silva testified that, when questioned about the firearms found in the efficiency, Dempsey initially denied ever touching, or having knowledge of the .22 Taurus handgun. (Tr. at 213, 233.) Later in the interview, however, Dempsey indicated that he recalled touching a gun two or three months prior -- but that "he did not know what caliber it was, and that it was an automatic," or that it "had a little piece of brown grip." (*Id.* at 302-04, 334.) Furthermore, when asked specifically

5

whether his DNA or finger prints would be on the .22 Taurus, Dempsey responded, "I hope not." (*Id.* at 336.)

According to Silva, in attempting to explain how the .22 Taurus ended up at his residence, and how his DNA could possibly be found on the firearm, Dempsey claimed that: (1) a young kid, a friend of Goldson's, brought the weapon over, (2) he took the weapon from the young man, (3) he emptied it, (4) he dropped the magazine, (5) he took each individual round out of the magazine, and that (6) he then gave the firearm, magazine, and ammunition back to the young man. (Tr. at 214-15, 336.) Specifically, Silva testified that Dempsey stated:

> that at one time there was weapons in that house, and that the weapons at 941 weren't his. He described how he used to be in the military, and that at one time this young kid, who was a friend of Goldson, came into the house with a weapon. The weapon, he described it to be a really small weapon, black with wood grip. ...
>
> He . . . then stated that since he was in the military, he emptied the weapon, he grabbed the weapon, dropped the magazine, individually took every round out of it.
>
> He said he pulled the slide back, make sure the weapon was clear, and . . . gave the young kid the weapon, the ammunition, and the magazine, and told him to take it out of the house.

(Tr. at 214-15.) Silva further testified that "the description of the gun [Dempsey] cleared and the way [Dempsey] described how [he] cleared the weapon, when he popped it, . . . is a similar gun [to the gun] that [officers] found" at 941 Kirkwood Street. (*Id.* at 307.)

### B. Detective Michael Simmons' Testimony

As its next witness, the government called Detective Michael Simmons. (Tr. at 335.) According to Simmons, as to the .22 caliber handgun, Dempsey claimed that:

6

> a few months prior, there was a gentleman in the house who had a gun that matched that description. [Dempsey] gave a description of a black gun. [Dempsey] said there was . . . like a brown handle. I don't think he said grip. But there was something brown on the back. He said this was a few months prior to the police coming to the house at 941 Kirkwood Street.

(Tr. at 336, 338.) Simmons further testified that Dempsey never specifically stated that the gun found at 941 Kirkwood was the same or similar to the gun from two months prior, or that the gun had a brown grip. (*Id.* at 339-40.)

      C.    **Detective Randolph Pfaff's Testimony**

The government next called Detective Randolph Pfaff. (Tr. at 342.) During his testimony, Pfaff described the officers' search of the 941 Kirkwood Street residence, including the heroin, firearms, and ammunition that were recovered from the search. (Tr. at 346-48.) Pfaff also recalled the interview that he and Silva conducted at the police station following Dempsey's arrest. (*Id.* at 353-54.) He indicated that the interview was "quite confusing" and that there "was a lot of going around in circles, trying to get questions answered" by the defendant. (*Id.* at 353.) Regarding the heroin recovered at 941 Kirkwood, Pfaff stated that Dempsey admitted that:

> it was in a black hat. Then [Dempsey] advised that he tossed it into the ceiling. When asked which room, he advised the bathroom, the bathroom, again, being the first-floor bathroom, which had a half-open-type ceiling.

(*Id.* at 354.) Pfaff testified that, as to the .22 caliber Taurus handgun, Dempsey initially claimed that "he had no knowledge of the firearms till the day of the incident." (Tr. at 355.) Pfaff also testified that Dempsey later "tried to suggest that his father-in-law once lived there" and "tried to . . . [lead] us to believe possibly it might be his [father-in-law's] firearm." (*Id.* at 355.)

7

In his testimony, Pfaff indicated that there were no fingerprints recovered from the .22 caliber Taurus handgun, and that the gun was not submitted for DNA testing. (Tr. at 349, 352.) He further explained, however, that, in his experience, (1) he had never "gotten favorable results from fingerprint tests" conducted on handguns, and (2) that the gun at issue in this case was not submitted for an examination for the presence of DNA due to the lengthy "backlog it takes for [the Medical Examiner] to process DNA" requests. (*Id.* at 352-53.)

### D. Special Agent Patrick Fyock's Testimony

The government also called Special Agent Patrick Fyock as a witness at trial. (Tr. at 426.) Fyock testified that he interviewed Dempsey, and in that interview he focused on the .22 Taurus handgun recovered from 941 Kirkwood Street. (*Id.* at 426, 428.) Specifically, when questioned about the .22 caliber handgun, Dempsey told Fyock that a young man who was a friend of Goldson "brought the firearm to the house" two or three months ago, "and that when he was inside the residence, he unloaded the firearm, made it safe, and then told either [Goldson] or the friend that he wanted to move it." (*Id.* at 428.)

Fyock further testified that Dempsey stated that he had just arrived at 941 Kirkwood when the police came into the residence, and that he had "control" of the residence. (Tr. at 428-29, 436-37.) In addition, Fyock indicated that, in the interview, Dempsey never admitted to touching the .22 caliber firearm at issue, but that he touched "a gun" a few months earlier. (*Id.* at 432-33.) Fyock further indicated that Dempsey claimed that he hoped the firearm would be tested for DNA because it would clear him, and that he did not know where the guns were located because they were not his guns. (*Id.* at 434-35.)

### E. Samadni Goldson's Testimony

At trial, the government also called Samadni Goldson as a witness. (Tr. at 393.) In his testimony, Goldson stated that he lived at 941 Kirkwood Street after Dempsey permitted him to stay there. (*Id.* at 393, 395.) He testified that he never used or sold heroin. (*Id.* at 352-53.) He also testified that he was asleep on the morning of May 8, 2007, and that he did not see any heroin in the residence prior to the police entering the home. (*Id.* at 395-98.) Goldson further testified that he never saw any firearms in the residence, and that he never touched any firearms while there. (Tr. at 398-99.) In addition, he testified that he never had any firearms within 941 Kirkwood, and, likewise, that none of his friends ever possessed a firearm while at the residence. (*Id.* at 399.) He also indicated that, during his time at 941 Kirkwood, Dempsey never asked one of Goldson's friends to leave the residence for possessing a firearm. (*Id.*)

### III. PARTIES' CONTENTIONS

Dempsey contends that he should be acquitted on Count Three of the indictment because the evidence adduced at trial was insufficient as a matter of law to support the jury's finding that he possessed the firearm charged in the indictment. (D.I. 72 at 1.) Specifically, he argues that the government failed to establish at trial that he either actually or constructively possessed the .22 caliber firearm as alleged. (*Id.* at 9.) He further argues that the government offered no evidence to show that he occupied the apartment where the firearm was found, or that he, otherwise, owned the firearm. (*Id.* at 10.)

The government, on the other hand, contends that Dempsey's claims are without merit, and that his motion should be denied. (D.I. 73.) The government contends that the evidence

presented at trial was sufficient for a jury to find Dempsey guilty of Count Three of the indictment. (*Id.* at 6.)

## IV. STANDARD OF REVIEW

A motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure may only be granted where the evidence is insufficient to sustain a conviction. *See United States v. Gonzalez*, 918 F.2d 1129, 1132 (3d Cir. 1990). In deciding such a motion, the court must view the evidence in the light most favorable to the government. *See United States v. Gambone*, 314 F.3d 163, 169-70 (3d Cir. 2003). Indeed, the jury verdict will stand if there is substantial evidence, either direct or circumstantial, to support the conviction. *Id.* at 169-70 (citations omitted); *see also United States v. Cohen*, 455 F.Supp. 843, 852 (E.D. Pa. July 18, 1978), *aff'd*, 594 F.2d 855 (3d Cir. 1979).

On a motion for judgment of acquittal, a defendant cannot prevail by raising questions as to the weight of the evidence or the credibility of the witnesses. *See Cohen*, 455 F.Supp. at 852. Instead, in order to prevail, a defendant must show that no rational jury "could have found [] guilt beyond a reasonable doubt based on the available evidence" presented at trial. *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). Thus, a finding that a jury verdict is insufficient as a matter of law should "be confined to [those] cases where the prosecution's failure is clear." *See United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) (citing *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984)).

## V. DISCUSSION

The elements of the crime of unlawful possession of a firearm by a felon are: (1) prior to the date alleged in Count Three of the indictment, Dempsey had been convicted in any court of a crime punishable by imprisonment for a term exceeding one year; (2) Dempsey knowingly possessed the

.22 caliber firearm charged in Count Three of the indictment; and (3) the .22 caliber firearm charged in Count Three of the indictment was in or affected interstate commerce before coming into Dempsey's possession. *See United States v. Dodd*, 225 F.3d 340, 344 (3d Cir. 2000). Dempsey's motion challenges only the second element of the charged offense, that is, whether Dempsey knowingly possessed the .22 caliber firearm charged in Count Three of the indictment.[9] Since the firearm at issue was not seized from Dempsey's person, the issue here is not whether Dempsey had actual possession of the gun, but whether the evidence adduced at trial was sufficient to prove that Dempsey had constructive possession of the firearm.

A person has constructive possession over a thing if he or she "'knowingly has both the power and the intention at a given time to exercise *dominion or control* over [the] thing, either directly or through another person or persons.'" *United States v. Iafelice*, 978 F.2d 92, 96 (3d Cir. 1992) (quoting *United States v. Blackston*, 940 F.2d 877, 883 (3d Cir. 1991)) (emphasis added). "Constructive possession necessarily requires both 'dominion and control' over an object and knowledge of that object's existence." *Iafelice*, 978 F.2d at 96 (citations omitted). Therefore, to show constructive possession, the government must prove beyond a reasonable doubt that: (1) Dempsey had knowledge of the firearm's existence; (2) Dempsey had the power to exercise dominion and control over the firearm; and (3) Dempsey had the intent to exercise dominion and control over the firearm. *See United States v. Bellinger*, 461 F. Supp. 2d 339, 346 (E.D. Pa. 2006).

The government cannot establish dominion and control by showing Dempsey's "mere proximity to the [firearm], or mere presence on the property where it is located. . . ." *United States*

---

[9] The parties stipulated to the first and third elements of the charged offense. (*See* D.I. 72 at 8.)

11

*v. Brown*, 3 F.3d 673, 680 (3d Cir. 1993) (quoting *United States v. Davis*, 461 F.2d 1026, 1036 (3d Cir. 1972)). In other words, ownership or control of a residence alone does not establish constructive possession of an item within that residence. *See United States v. Bethly*, 511 F. Supp. 2d 426, 431 9D. Del. 2007) (citation omitted). The government can establish dominion and control, however, by adducing additional evidence -- including "connection with a gun, proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise -- coupled with proximity." *Bellinger*, 461 F. Supp. 2d at 347 (quoting *United States v. Booker*, 436 F.3d 238, 242 (D.C. Cir. 2006)). Furthermore, this additional evidence can also include evidence that the defendant attempted to hide or destroy the contraband. *See United States v. Jenkins*, 90 F.3d 814, 818 (3d Cir. 1996).

Here, Dempsey contends that the evidence adduced at trial was insufficient to show that he had knowledge of the .22 caliber firearm, or that he had the intent to exercise dominion and control over the firearm. The court disagrees. The court concludes that there was sufficient evidence presented at trial for a reasonable jury to find that the defendant knew of the .22 caliber firearm, and that he had the power and intent to exercise dominion and control over that firearm.

First, there is sufficient circumstantial evidence to support a finding that the defendant knew of and exercised dominion and control over the gun. Indeed, the government presented "substantial evidence" at trial concerning Dempsey's possession of the .22 caliber handgun. *See Gambone*, 314 F.3d at 169-70 (stating that the court "must sustain the verdict if there is substantial evidence") (citations omitted). Specifically, the evidence presented at trial, and presumably considered by the jury, included the following: (1) Dempsey owned, controlled, and had access to the residence at 941 Kirkwood Street; (2) Dempsey was found in a hallway outside of closet where the firearm was

located; (3) the firearm was concealed in the same manner as the heroin located in the ceiling of the efficiency's bathroom; (4) the firearm was wrapped in a black knit cap and tied with green rubber-bands; (5) Dempsey admitted to touching and hiding heroin in the bathroom ceiling; (6) the heroin that was found in the bathroom ceiling was also wrapped in a black knit cap and tied with green rubber-bands; (7) Dempsey gave different stories to investigators regarding the .22 caliber firearm; (8) Dempsey's statements suggested a particular familiarity with certain unique characteristics of the .22 Taurus firearm; (9) Goldson's testimony that he never had any firearms within 941 Kirkwood and that none of his friends ever possessed a firearm while at the residence; and (10) Goldson's testimony that Dempsey never asked one of Goldson's friends to leave the residence for possessing a firearm. In viewing this evidence in the light most favorable to the government, the court cannot say that this evidence is insufficient, as a matter of law, to support the jury's finding.

In addition, according to the evidence presented at trial, the court is satisfied that there are a number of reasonable inferences and conclusions that would support the jury's verdict. First, as the government correctly suggests, the jury could have reasonably inferred that the defendant is familiar with the residence and the contents of the residence, including the .22 caliber firearm in question. Indeed, Dempsey was found inside the small efficiency apartment in a hallway outside the closet where the firearm was located. He also admitted to officers that he controlled the residence. Second, from the evidence presented at trial, the jury could have also reasonably inferred that the person who packaged and hid the heroin (*i.e.*, Dempsey) is the same person who packaged and hid the .22 caliber firearm -- particularly since both the heroin and the .22 caliber firearm were distinctively hidden in black knit caps and tied with green rubber-bands. Third, the jury could have also reasonably concluded that Dempsey's statement about the firearm he found "two or three

months" prior to the search was not credible, and that it was an attempt by Dempsey to explain why his fingerprints and DNA might be found on the .22 caliber firearm. Fourth, the jury could have also reasonably concluded that Goldson's testimony was credible, and that Dempsey's explanations regarding the .22 caliber firearm to the contrary were not. Still, Dempsey does not contest that, two or three months ago, "when he was inside the residence, he unloaded the firearm, made it safe". (Tr. at 428.) The court is, nonetheless, required to "draw all reasonable inferences in favor of the jury's verdict." *See United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) (citations omitted). In this regard, Dempsey's motion must, therefore, be denied.

Furthermore, the court is persuaded that, from this evidence, the jury could have concluded beyond a reasonable doubt that Dempsey had knowledge of the .22 caliber firearm, and that he had the intent to exercise dominion and control over the .22 caliber firearm. Moreover, Dempsey has not demonstrated that no rational jury "could have found [] guilt beyond a reasonable doubt based on the available evidence" presented at trial. *See Brodie*, 403 F.3d at 133. The court must, therefore, deny his motion for judgment of acquittal.

## VI. CONCLUSION

For the foregoing reasons, and because Dempsey has not met his burden of showing that the evidence presented at trial was insufficient to support his conviction, the court will deny his motion.

Dated: March 16, 2009

CHIEF, UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Criminal Action No. 07-74-GMS |
| ELVIN DEMPSEY, | ) ) ) |
| Defendant. | ) ) |

### ORDER

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED THAT:

1. The defendant's motion for judgment of acquittal (D.I. 68) is DENIED.

Dated: March 16, 2009

_____
CHIEF, UNITED STATES DISTRICT JUDGE